## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

DEFENDERS OF WILDLIFE
1130 17th Street, NW
Washington, DC 20036

Case No. 19-cv-746

SIERRA CLUB
P.O. Box 12047,
610 West Broadway, Suite 105
Jackson, WY 83002

NATIONAL WILDLIFE REFUGE ASSOCIATION
1001 Connecticut Ave. NW, Suite 905
Washington, DC 20036

       Plaintiffs,

   v.

U.S. FISH AND WILDLIFE SERVICE
1849 C Street, NW
Washington, DC 20240

      Defendant.

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

## INTRODUCTION

1.     Plaintiffs in this case challenge the U.S. Fish and Wildlife Service's (the Service's) unreasonable delay in taking legally mandated steps to end the agency's program for artificial feeding of wild elk wintering on the Jackson Hole National Elk Refuge, where feeding exposes the elk to a host of severe disease threats.  Plaintiffs also challenge the Service's 2019 decision to begin winter elk feeding on the Refuge, given that "unmitigated continuation of supplemental feeding … undermine[s] the conservation purpose of the National Wildlife Refuge System." Defs. of Wildlife v. Salazar, 651 F.3d 112, 117 (D.C. Cir. 2011).  Through both its delay and its affirmative initiation of the supplemental feeding program, the Service has violated

the National Wildlife Refuge System Improvement Act ("Improvement Act"), Pub. L. No. 105-57, 111 Stat. 1252 (1997) (codified at 16 U.S.C. §§ 668dd-668ee).

2.      The Service began feeding elk on the National Elk Refuge at the beginning of the 20th century, in an attempt to prevent starvation of elk overwintering on the Refuge and to address conflicts between elk and local ranchers.  But the feeding, though well-intentioned, threatens grave harm to elk on the Refuge and throughout the Greater Yellowstone Ecosystem. Feeding causes elk to congregate in unnatural numbers and density on the Refuge, facilitating the spread of disease within the herd.  In particular, the fed elk are at a high risk of contracting chronic wasting disease ("CWD"), a debilitating and deadly condition similar to mad cow disease that has been spreading westward across the state of Wyoming for decades.  The Refuge feeding program therefore threatens to become a vector for contagion that could spread throughout the Greater Yellowstone Ecosystem and harm Wyoming, Montana, and Idaho elk populations.

3.      Chronic wasting disease is no longer a "someday" threat to the Refuge elk.  On November 21, 2018, the Wyoming Game and Fish Department confirmed detection of chronic wasting disease in a mule deer that was struck and killed by a vehicle within Grand Teton National Park, directly adjacent to the Refuge.  This detection places CWD on the doorstep of the National Elk Refuge—if it is not already present but undetected there.

4.      The solution to this imminent wildlife disease crisis is simple:  the Service must stop feeding wild elk, thereby reducing the numbers and density of elk on the Refuge so that diseases cannot be so easily transmitted through the elk population.  Indeed, recognizing this urgent need, the Service itself resolved to phase out its supplemental feeding program in a 2007 Bison and Elk Management Plan for the National Elk Refuge.  Yet twelve years later, the Service

has failed to take the first step promised by that plan toward phasing out the supplemental feeding program.  As recent events have demonstrated, it is critical to act now to mitigate the effects of disease on the iconic Jackson Hole elk herd.  The window for preventing, or at least minimizing, the spread of CWD on the Refuge and beyond is swiftly closing.

5.     Because further delay presents an imminent threat to one of our nation's most revered wildlife populations and the National Elk Refuge itself, Plaintiffs now turn to this Court for relief.

## JURISDICTION AND VENUE

6.     This action arises under the Improvement Act and the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701-706, which waives the Service's sovereign immunity, see id. § 702.

7.     This Court has jurisdiction over Plaintiffs' claims pursuant to 28 U.S.C. § 1331 (federal question), and may issue a declaratory judgment and further relief pursuant to 28 U.S.C. §§ 2201-02.

8.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(e)(1) because Plaintiffs Defenders of Wildlife and National Wildlife Refuge Association and Defendant U.S. Fish and Wildlife Service reside in this district.

## PARTIES

9.     Plaintiff Defenders of Wildlife ("Defenders") is a Washington D.C.-based non-profit membership organization dedicated to the protection of all native animals and plants in their natural communities, including on our country's national wildlife refuges, the only system of federal lands dedicated specifically to the conservation and management of wildlife. Defenders has more than 349,000 members across the nation.

10.    Plaintiff Sierra Club is a national non-profit organization with 67 chapters and more than 3.5 million members and supporters dedicated to exploring, enjoying, and protecting the wild places of the earth; to practicing and promoting the responsible use of the earth's ecosystems and resources; to educating and enlisting humanity to protect and restore the quality of the natural and human environment; and to using all lawful means to carry out these objectives.

11.    Plaintiff National Wildlife Refuge Association ("NWRA") is a Washington D.C.-based non-profit organization dedicated to protecting, enhancing, and expanding the National Wildlife Refuge System—lands set aside by the American people to protect our country's diverse wildlife heritage.  By combining policy, grassroots development, and public education objectives, NWRA works to strengthen the ecological integrity of our national wildlife refuges and thus to ensure a diverse spectrum of plants and wildlife well into the future.

12.    Plaintiffs' members use, live, work, hunt, and recreate in the Jackson Hole area and throughout the Greater Yellowstone Ecosystem.  Members of each of the Plaintiff organizations visit the National Elk Refuge, Grand Teton National Park, and other areas within the Greater Yellowstone Ecosystem to observe and conserve wildlife, native landscapes, and unspoiled ecological processes.

13.    The Service's authorization of continued feeding operations within the National Elk Refuge perpetuates unnaturally high densities of elk on the Refuge, causing unnatural wildlife behaviors and amplifying the spread of wildlife disease, thereby resulting in significant, ecosystem-wide impacts.  The legal violations alleged in this complaint accordingly cause direct injury to the aesthetic, conservation, recreational, scientific, educational, and wildlife preservation interests of the members of the Plaintiff organizations.

14.     These interests of Plaintiffs' members have been, are being, and, unless the relief sought here is granted, will continue to be adversely and irreparably injured by the Service's failure to comply with federal law.  These are actual, concrete injuries, traceable to the Service's conduct, that would be redressed by the requested relief.  Plaintiffs have no adequate remedy at law.

15.     Defendant U.S. Fish and Wildlife Service is the federal agency that administers the National Elk Refuge, including by managing and conducting the supplemental elk feeding program.

## BACKGROUND

## I.     SUPPLEMENTAL FEEDING ON THE NATIONAL ELK REFUGE

16.     The National Elk Refuge was set aside by Congress in 1912 as a "winter game (elk) reserve."  Act of Aug. 10, 1912, Pub. L. No. 62-261, 37 Stat. 293 (codified as amended at 16 U.S.C. § 673).  Situated in Jackson Hole, just north of the town of Jackson, Wyoming, the Refuge is flanked by the dramatic expanses of the Teton and Gros Ventre mountain ranges and adjoins Grand Teton National Park.  Its land has long provided critical winter habitat for populations of elk, bison, and other wildlife migrating down from the higher elevations of the Greater Yellowstone Ecosystem.  The combination of stunning scenery, spectacular wildlife, and ease of public access makes the National Elk Refuge one of the flagships of the National Wildlife Refuge System.

17.     The Service has fed elk wintering on the National Elk Refuge since the beginning of the 20th century.  As originally conceived, feeding was intended to prevent excessive starvation among one of the last remaining large elk herds in North America and reduce conflicts between elk and local ranchers.

18.    "[T]his practice, though born of benevolence, causes significant problems."  Defs. of Wildlife, 651 F.3d at 113.  As much as 80 percent of the elk herd in the region in and around Jackson is drawn to the Refuge's feedlines every winter.  This unnatural concentration of elk increases the prevalence of debilitating diseases such as brucellosis, which causes infected females to abort their first calves:  while brucellosis infects about 2% of elk in an ordinary herd, 17% of elk wintering on the Refuge have contracted this disease.

19.    The far greater threat to elk, however, is chronic wasting disease.  Chronic wasting disease, which is similar to mad cow disease in domestic cattle, is always fatal in elk and other members of the deer family, known as cervids.  There is no known effective vaccine or treatment.

20.    Healthy animals contract chronic wasting disease through exposure to prions, which are abnormal proteins that are carried and shed by infected animals.  Once prions enter the soil—which may occur when infected animals shed saliva or other body fluids into the environment, or die and decompose—the proteins may be taken up by plants, then spread to deer and elk that consume the contaminated plants.  CWD prions are extremely difficult to remove from the environment; they may persist in soil and plants for years after they are first introduced to an area.  Thus, introduction of chronic wasting disease into the Refuge elk population threatens to convert the very Refuge itself into a toxic disease contamination site.

21.    Chronic wasting disease was first found in wild elk in Wyoming in the 1980s. Since then, the disease has spread inexorably from southeast Wyoming towards the Greater Yellowstone Ecosystem and the Refuge.



Figure 1: Chronic Wasting Disease in Wyoming Endemic Deer Hunt Areas

22.     Supplemental feeding, which tends to concentrate elk in unnatural numbers on the Refuge, threatens to exacerbate the spread of CWD among Refuge elk and, when infected elk disperse at the end of the winter, throughout the Greater Yellowstone region.  According to a January 20, 2017 report by a Refuge biologist:

> Elk are fed on the same 5,000 acres of [the Refuge] each year, and given the persistence of CWD prions in the environment, these areas will likely become heavily contaminated with the CWD prion over time if status quo management continues.  60-80% of the Jackson elk herd use [National Elk Refuge] feedgrounds each winter, which will regularly expose these elk to CWD prions at these sites.  Various elk migration studies and research on another disease prevalent on [the Refuge], (brucellosis), suggest that the current feeding regime and its associated high concentrations of elk could be a source of CWD infection for cervids throughout the Greater Yellowstone Ecosystem.

7

National Elk Refuge Biological Update 3 (Jan. 20, 2017).

23.     Chronic wasting disease has now arrived on the doorstep of the National Elk Refuge.  On November 21, 2018, the Wyoming Game and Fish Department confirmed detection of chronic wasting disease in a mule deer that was struck and killed by a vehicle within Grand Teton National Park, which adjoins the Refuge.   Meanwhile, the Refuge's supplemental feeding program continues apace.

## II.     THE D.C. CIRCUIT WARNS THE SERVICE THAT IT MUST END THE SUPPLEMENTAL FEEDING PROGRAM

24.     The Service, as steward of the nation's wildlife refuges, is required under the National Wildlife Refuge System Improvement Act to "provide for the conservation of fish, wildlife, and plants, and their habitats within the [National Wildlife Refuge] System" by "sustain[ing] and, where appropriate, restor[ing] and enhanc[ing], healthy populations of fish, wildlife, and plants."  16 U.S.C. §§ 668dd(a)(4)(A), 668ee(4).  Consistent with this mandate, the Service is further obligated to "ensure that the biological integrity, diversity, and environmental health of the System are maintained for the benefit of present and future generations of Americans."  16 U.S.C. § 668dd(a)(4)(B).

25.     To promote this conservation mandate, the Improvement Act further requires the Service to issue a "comprehensive conservation plan" for managing each Refuge.  16 U.S.C. § 668dd(e)(1)(A).  Under the Act, the Service "shall manage the refuge … in a manner consistent with the plan."  Id. § 668dd(e)(1)(E).

26.     Supplemental feeding, which promotes the spread of dangerous diseases among the very elk that the Refuge was created to protect and threatens to contaminate the Refuge itself with contagious disease materials (including chronic wasting disease prions), violates this mandate for the Service to ensure the health and integrity of the elk and their environment.

27.     The Service addressed its obligations under the Improvement Act in light of the disease threat presented by the Refuge supplemental feeding program by issuing a Bison and Elk Management Plan for the National Elk Refuge in 2007.  The Bison and Elk Management Plan constitutes a portion of the "comprehensive conservation plan" required by the Improvement Act:  in the 2007 plan itself, the Service stated that the Bison and Elk Management Plan "will be incorporated as part of the comprehensive conservation plan."  U.S. Fish & Wildlife Serv. & Nat'l Park Serv., Bison & Elk Mgmt. Plan 13 (Apr. 2007) ("Bison and Elk Management Plan"); see also 16. U.S.C. § 668dd(e)(1)(A).  In 2015, the Service adopted a comprehensive conservation plan for the Refuge that states that the Service will "[a]daptively manage bison, elk, and other wildlife populations and habitats as outlined in the Bison and Elk Management Plan."  U.S. Fish & Wildlife Serv., Nat'l Elk Refuge, Comprehensive Conservation Plan 95 (Sept. 2015) ("Comprehensive Conservation Plan"); see also id. at xi ("This comprehensive conservation plan will complement, not replace, the Bison and Elk Management Plan.").

28.     The Bison and Elk Management Plan called for the Service to "develop a structured framework, in collaboration with the Wyoming Game and Fish Department, of adaptive management criteria and actions for transitioning from intensive supplemental winter feeding of bison and elk herds to greater reliance on natural forage on the refuge."  Bison and Elk Management Plan at 135.  The Plan suggested that the required framework could include the following measures:  "delay[ing] the onset of feeding each year, decreas[ing] the average daily ration per elk or bison … , decreas[ing] the number of days of supplemental feeding, decreas[ing] the frequency of years of providing supplemental feed, increas[ing] [elk] harvest levels, and implement[ing] mitigation measures … to reduce conflicts created by redistribution of elk and bison."  Id. at 136-37.  The Plan called for a "complete transition to free-standing

forage if and when several established criteria are met, including support from the Wyoming

Game and Fish Department." Id. at 137.

29.    The 2007 plan called for the Service to develop this framework "[b]y year one" of

the plan's implementation, meaning 2008.  Bison and Elk Management Plan at 135.  The plan

did not specify a deadline for the Service to end supplemental feeding on the Refuge.

30.    Recognizing that swift action was needed to prevent chronic wasting disease from

spreading to the Refuge and its winter elk population, several conservation organizations,

including two of the Plaintiffs in this case, challenged the Service's 2007 plan in this District.

The plaintiffs in that case argued that the Service's decision to continue winter-time

supplemental feeding, with no commitment to terminate the program by a specified deadline,

was arbitrary and unlawful under the Improvement Act.  The plaintiffs also argued that the

Service unlawfully gave Wyoming officials the power to veto any plan the Service might

propose to end supplemental feeding.  Defs. of Wildlife, 651 F.3d at 116, 118.

31.    The district court granted summary judgment for the Service in 2010, and the

D.C. Circuit affirmed in 2011.  Nevertheless, the Court of Appeals agreed with the plaintiffs in

that case that continuation of the Refuge supplemental feeding program was inconsistent with the

Service's statutory duties:

> [T]he whole point of a National Elk Refuge is to provide a sanctuary in which
> populations of healthy, reproducing elk can be sustained. See 16 U.S.C. § 673a
> (creating a "refuge" for the elk).  The Refuge can hardly provide such a sanctuary
> if, every winter, elk and bison are drawn by the siren song of human-provided
> food to what becomes, through the act of gathering, a miasmic zone of life-
> threatening diseases.

Defs. of Wildlife, 651 F.3d at 116.  Accordingly, the D.C. Circuit concluded, "[t]here is no doubt

that unmitigated continuation of supplemental feeding would undermine the conservation

purpose of the National Wildlife Refuge System." Id. at 117.

10

32.     Further, while rejecting the plaintiffs' contention that the Service acted unlawfully by adopting a plan that contained no deadline for ending supplemental feeding, the D.C. Circuit stated that the Service's Bison and Elk Management Plan for the National Elk Refuge "might well have been unreasonable had the agencies categorically refused to phase out the winter feeding program":

> The [plaintiffs] are understandably concerned that [the plan's] flexibility could be used to continue the practice indefinitely.  But the agencies must proceed in a manner that is consistent with the science and accounts for the risks posed by supplemental feeding.  …  It is highly significant and indeed dispositive to us, as it was to the district court, that the agencies are committed to ending supplemental feeding.  We do not know precisely how they will proceed, and that makes it impossible, at this stage, to declare that their plan is arbitrary and capricious simply because it does not specify a particular date by which the practice will cease.  Should the agencies act unreasonably in establishing criteria for the transition or in otherwise carrying out the plan, that will be a different issue for another panel.

Defs. of Wildlife, 651 F.3d at 117 (quotation omitted).

33.     The D.C. Circuit also relied on the Service's assurance that the 2007 Bison and Elk Management Plan "confers no veto" on the State of Wyoming.  Id. at 118.  "We take the Secretary at his word that Wyoming has no veto over the Secretary's duty to end a practice that is concededly at odds with the long-term health of the elk and bison in the Refuge."  Id.

## III.     THE SERVICE FAILS TO ADOPT ANY PLAN TO END SUPPLEMENTAL FEEDING

34.     In the nearly twelve years since adoption of the 2007 Bison and Elk Management Plan and more than seven years since the D.C. Circuit's decision, the Service has failed to take the action it promised to phase out the supplemental feeding program at the National Elk Refuge. The Service has not even developed its promised plan to do so.  Specifically, the Service has failed to issue the "structured framework" to transition away from supplemental feeding—which the Service has subsequently described as a "Step-Down Plan"—that the Bison and Elk

Management Plan promised for issuance in 2008.  In other words, the Service has not "proceed[ed] in a manner that is consistent with the science and accounts for the risks posed by supplemental feeding," but instead has used the Bison and Elk Management Plan's "flexibility" in a manner that—after twelve years' delay— appears likely "to continue the practice indefinitely."  Defs. of Wildlife, 651 F.3d at 117.  Accordingly, the "unmitigated continuation of supplemental feeding," which "undermine[s] the conservation purpose of the National Wildlife Refuge System," id., continues at the National Elk Refuge.

35.     As documents obtained by Plaintiffs through the Freedom of Information Act demonstrate, this failure is largely due to the Service's ongoing, and apparently complete, deference to objections raised by officials from the Wyoming Game and Fish Department.

36.     After the Service issued the 2007 Bison and Elk Management Plan, development of the promised Step-Down Plan was initially delayed for six years.  After conservation groups challenged the 2007 Bison and Elk Management Plan, the Service "decided not to move forward with the [Step-Down Plan] … process until after the conclusion of this lawsuit." Will Meeks, Assistant Reg'l Dir., Response to Lloyd Dorsey's Questions in His Request for a Tel. Conversation with the Reg'l Dir. 2 (July 1, 2013).  The Service made this decision to delay its development of the promised Step-Down Plan notwithstanding that the lawsuit sought to hasten the Service's action to move away from intensive supplemental feeding on the Refuge, not to delay it.  When the lawsuit ended in 2011, the Service delayed another two years, citing the fact that the National Elk Refuge was in the middle of another planning process "and did not have the resources to simultaneously develop the [Step-Down Plan]."  Id.

37.     The Step-Down planning process began, according to Service emails, sometime in 2013.  Between May 2013 and April 2014, the Service held several meetings to discuss the contents of the Step-Down Plan with stakeholders.

38.     Plan development stalled, however, between May and October 2014, largely because of Wyoming's "strenuous resistance to any serious discussion about ending supplemental feeding."  Steve Kallin, Nat'l Elk Refuge Project Leader, Nat'l Elk Refuge / Adaptive Mgmt. Plan Briefing Statement Topics, Conference Call with Reg'l Dir. 2 (Nov. 17, 2014).  In November 2014, Wyoming suggested that, rather than aim to reduce the need for winter supplemental feeding by reducing the size of the Jackson elk herd, the Service should adopt changes in the feeding schedule that would redistribute the elk, causing fewer elk to winter on the Refuge.

39.     The Service moved forward with Wyoming's proposal.  A draft of the Step-Down Plan produced in July 2015 provided that the start of supplemental feeding would initially be delayed approximately two weeks, "depending on several variables," such as forage availability. Nat'l Elk Refuge, Grand Teton Nat'l Park, Draft Bison & Elk Mgmt. Step Down Plan 14 (July 24, 2015) ("July 2015 Draft Step-Down Plan").  The Service also proposed to end the supplemental feeding season a week earlier.  The Service believed shortening the feeding season would condition elk to seek food on native winter range off of the Refuge, and thus redistribute the Jackson elk population so that fewer elk would congregate on the Refuge and less supplemental feeding would be required.

40.     On August 3, 2015, when the Step-Down Plan "was nearing completion," the Service sent a draft to the Wyoming Game and Fish Department's Wildlife Administration office in Cheyenne, Wyoming.  Steve Kallin, Step Down Plan Conference Call 2 (Dec. 3, 2015).   After

an unexplained three-month delay, Wyoming Game and Fish Department officials told the

Service on November 13, 2015 that they would not support the Plan.  When asked what

alternative management strategies Wyoming would support, the Wyoming game officials had no

immediate suggestions.

41.     On November 18, 2015, Wyoming officials indicated that they would support the

proposed Step-Down Plan if, instead of beginning with a two-week delay in feeding initiation,

the Service "buil[t] in flexibility so the start date can be adaptively adjusted to prevent elk from

leaving the [Refuge] and causing conflicts with ranchers & private landowners."  Id.  at 4.

Alternatively, Wyoming officials stated that they would support "a 'one week delay' in feeding

initiation and a 'two week' early cessation of feeding."  Id.  Wyoming officials opined that

"these efforts would demonstrate sufficient effort toward achieving the goals in the [Bison and

Elk Management Plan] the next time it is challenged in court."  Id. at 4.  Service staff noted,

however, that Wyoming's suggestions "would impact the key components of the Step Down

Plan and would likely result in no meaningful changes in elk redistribution."  Id. at 4.

42.     Despite these staff concerns, the Service acquiesced to Wyoming's new proposal.

The most recent version of the Step-Down Plan obtained by the Plaintiffs, dated October 2016,

eliminates the two-week delay in the onset of supplemental feeding originally proposed by the

Service, providing instead that "the initiation of feeding will be delayed for short durations of

time (days)."  Nat'l Elk Refuge, Grand Teton Nat'l Park, Draft Step-Down Plan, Bison and Elk

Mgmt. ix (Oct. 2016) ("October 2016 Draft Step-Down Plan").  The October 2016 Plan also

softens the requirement that feeding terminate one week earlier:  while a July 2015 draft of the

plan provided that "[i]nitially, the termination of feeding . . . will occur about one week earlier,"

July 2015 Draft Step-Down Plan at 15 (emphasis added), the October 2016 draft stated that "[i]n

the early years of Step-Down Plan implementation, the seasonal termination of feeding <u>is</u>

<u>expected to</u> occur about a week earlier than current conditions … ," October 2016 Draft Step-

Down Plan at x (emphasis added).  As an outside expert who reviewed the October 2016 draft at

the request of the Service noted, "there does not appear to be any firm commitment to reducing

feeding as the narrative is vague with regard to the magnitude of reduction in days of feeding

…."  Key Items from Peer Review 1 (Aug. 9, 2016) (comments from Bob Garrott, Montana State

University).

43.     In late September 2016, the Service decided to "take a 'strategic pause'" before

circulating the latest draft of the Step-Down Plan for public comment.  Email from Steve Kallin

to Dale Deiter et al. (Sep. 28, 2016).  The Service cited "[b]ad timing in the Election Cycle" and

the need to provide more time for public comment.  <u>Id.</u>  Service staff "anticipate[d] the process

to resume after completion of the next supplemental feeding season."  <u>Id.</u>

44.     Despite the passage of more than two years since that "strategic pause," the

Service has not issued its Step-Down Plan or otherwise publicly taken any steps to fulfill the

promise that the Service made in 2007 to issue that plan by 2008.

45.     The Service's failure to fulfill its promises again came before the D.C. Circuit in

2017, when that Court addressed a different facet of elk management in Jackson Hole,

Wyoming, concerning federal agency authorizations for recreational elk hunting.  <u>See</u> <u>Mayo v.</u>

<u>Reynolds</u>, 875 F.3d 11 (D.C. Cir. 2017).  In the course of resolving that dispute, the D.C. Circuit

noted the Service's promise in the 2007 Bison and Elk Management Plan to phase out the

supplemental feeding program and commented that the Service "failed to meet the 2007 Plan's

objective to wean the herd from supplemental feed."  <u>Id.</u> at 14.  The D.C. Circuit also stated that,

"[a]lthough the [Service] never committed to ending supplemental feeding by any specific date,

its failure to decrease supplemental feeding obviously is not in keeping with one of the goals of

the [2007 Bison and Elk Management Plan]."  Id. at 24.

46.     Despite the Service's inaction in implementing the Bison and Elk Management

Plan, the threat of CWD and the need to end supplemental feeding on the Refuge have become

even more pressing in recent years.  As a Refuge biologist wrote in January 2017:  "Although the

exact time frame is unclear, introduction of CWD into the Jackson elk herd appears inevitable

and could occur at any time."  National Elk Refuge Biological Update 3 (Jan. 20, 2017).

47.     Whatever time the Service may have thought it had to preemptively address the

threat of chronic wasting disease in Jackson Hole has now run out.  The November 21, 2018

detection of chronic wasting disease in a mule deer in Grand Teton National Park places CWD

adjacent to the Refuge, in an area where elk, deer, and moose can easily cross the boundary

between the two jurisdictions.  Accordingly, immediate action is required to abate the threat of

chronic wasting disease at the National Elk Refuge and the Greater Yellowstone Ecosystem as a

whole, and further delay threatens the integrity of some of our nation's most revered public

landscapes and wildlife.

**FIRST CLAIM FOR RELIEF**
(Unlawful Withholding and Unreasonable Delay
in Taking Action Required by Improvement Act)

48.     All preceding paragraphs are hereby incorporated as if fully set forth herein.

49.     The Improvement Act requires the Service to manage refuges to "provide for

the conservation of fish, wildlife, and plants, and their habitats within the System" and to "ensure

that the biological integrity, diversity, and environmental health of the System are maintained for

the benefit of present and future generations of Americans."  16 U.S.C. § 668dd(a)(4)(A), (B).

The Act also instructs the Service to "sustain and, where appropriate, restore and enhance,

16

healthy populations of fish, wildlife, and plants utilizing ... methods and procedures associated

with modern scientific resource programs." <u>Id.</u> § 668ee(4).

50.     In its 2007 Bison and Elk Management Plan, the Service committed to issue a

plan to phase out its supplemental feeding program on the National Elk Refuge "[b]y year one"

of that plan's implementation period, <u>i.e.</u>, 2008.

51.     The Bison and Elk Management Plan constitutes a portion of the comprehensive

conservation plan for the National Elk Refuge required by the Improvement Act.  Bison and Elk

Management Plan at 13 (stating that Bison and Elk Management Plan "will be incorporated as

part of the comprehensive conservation plan").  That comprehensive conservation plan states that

the Service will "[a]daptively manage bison, elk, and other wildlife populations and habitats as

outlined in the Bison and Elk Management Plan."  Comprehensive Conservation Plan at 95; <u>see</u>

<u>also</u> 16. U.S.C. § 668dd(e)(1)(A)(iii) (requiring the Service to "issue a final conservation plan for

each planning unit" of the National Wildlife Refuge System outside of Alaska).

52.     Under the Improvement Act, the Service must "manage the refuge … in a manner

consistent with" the comprehensive conservation plan.  16 U.S.C. § 668dd(e)(1)(E).

53.     The provisions of the Bison and Elk Management Plan are therefore binding on

the Service, and the Plan's requirement that the Service issue a plan to phase out supplemental

feeding by 2008 is mandatory under the Improvement Act.

54.     The D.C. Circuit held that the 2007 Bison and Elk Management Plan complied

with the Improvement Act only because the Service "committed to end[] supplemental feeding"

through the transition program, which the Service promised would begin with issuance of the

phase-out plan (subsequently referenced as the Step-Down Plan).  <u>Defs. of Wildlife</u>, 651 F.3d at

117.  The Court of Appeals stated that "[t]here is no doubt that unmitigated continuation of

supplemental feeding would undermine the conservation purpose of the National Wildlife

Refuge System." Id.

55.     Twelve years later, the Service has not issued the promised plan, or taken any

other steps to begin the promised phase out of supplemental feeding on the Refuge.  The Service

has thus "failed to take a discrete agency action that it is required to take," Norton v. S. Utah

Wilderness All., 542 U.S. 55, 64 (2004), and has provided no rational explanation for that

failure.

56.     To the contrary, the Service's delay in issuing the long-promised plan has been

largely due to the Service's deference to objections by the Wyoming Game and Fish Department.

The Service has thus effectively given the Wyoming Game and Fish Department a veto over

issuance of the supplemental feeding phase-out plan, contrary to the Service's representations to

the D.C. Circuit in 2011.  See Defs. of Wildlife, 651 F.3d at 117 ("We take the Secretary at his

word that Wyoming has no veto over the Secretary's duty to end a practice that is concededly at

odds with the long-term health of the elk and bison in the Refuge.").

57.     For all these reasons, the Service's issuance of the promised Step-Down Plan to

phase out supplemental feeding on the Refuge constitutes "agency action unlawfully withheld or

unreasonably delayed," and this Court should compel the Service to issue the Step-Down Plan.  5

U.S.C. § 706(1).

### SECOND CLAIM FOR RELIEF
(Violation of Improvement Act Through
Unmitigated Continuation of Supplemental Feeding)

58.     All preceding paragraphs are hereby incorporated as if fully set forth herein.

59.     The Service decided to initiate feeding at the National Elk Refuge for the 2019

winter season on February 6, 2019.

60.     The Service's decision perpetuates the "unmitigated continuation of supplemental feeding" at the National Elk Refuge, which "undermine[s] the conservation purpose of the National Wildlife Refuge System" in violation of the Improvement Act.  <u>Defs. of Wildlife</u>, 651 F.3d at 117; <u>see</u> 16 U.S.C. §§ 668dd(a)(4)(A), (B), 668ee(4).

61.     The decision to begin feeding without taking steps toward ending the feeding program further violates the 2007 Bison and Elk Management Plan, which required the Service to issue a plan to phase out the feeding program in 2008.  As discussed, this plan requirement is binding on the Service pursuant to the Improvement Act.  16 U.S.C. § 668dd(e)(1)(E).

62.     The Service's unmitigated continuation of supplemental feeding at the National Elk Refuge is therefore arbitrary and unlawful in violation of the Improvement Act.

## RELIEF REQUESTED

THEREFORE, Plaintiffs respectfully request that this Court:

1.     Declare that the Service violated the Improvement Act by unlawfully withholding and unreasonably delaying issuance of the plan promised in the 2007 Bison and Elk Management Plan to phase out supplemental feeding at the National Elk Refuge;

2.     Declare that the Service violated the Improvement Act by perpetuating the unmitigated continuation of supplemental feeding at the National Elk Refuge through the initiation of the 2019 winter feeding program on February 6, 2019;

3.     Compel the Service to issue, within 30 days of this Court's judgment, the plan promised in the 2007 Bison and Elk Management Plan to phase out supplemental feeding on the National Elk Refuge;

4.     Award Plaintiffs their reasonable fees, costs, and expenses, including attorneys' fees, associated with this litigation; and

5.      Grant Plaintiffs such further and additional relief as the Court may deem just and

proper.

Respectfully submitted this 18th day of March, 2019.

/s/ Timothy J. Preso
Timothy J. Preso (D.C. Bar No. 456531)
Earthjustice
313 East Main Street
Bozeman, MT 59715
tpreso@earthjustice.org
(406) 586-9699 | Phone
(406) 586-9695 | Fax

*Counsel for Plaintiffs*